UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------X

GEORGE A. AGOSTINI,

                Plaintiff,

      -against-

COMMISSIONER OF SOCIAL SECURITY,

                Defendant.

-------------------------------------X

NOT FOR PUBLICATION

**MEMORANDUM & ORDER**

13-CV-2175 (KAM)

**MATSUMOTO, United States District Court Judge**

        Pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3),
plaintiff George Agostini ("plaintiff") seeks judicial review of
the final decision of defendant Acting Commissioner of Social
Security ("defendant" or the "Commissioner") denying plaintiff's
application for Social Security Disability benefits ("SSD")
under Title II, and for Supplemental Security Income benefits
("SSI") under Title XVI.[1]  Plaintiff, proceeding *pro se*, argues
that he is entitled to receive these benefits due to his severe
medically determinable impairment, including carpal tunnel
syndrome, major dysfunction of a joint, cervical and lumbar

---

[1] Individuals may seek judicial review in the United States district court for
the judicial district in which they reside of any final decision of the
Commissioner of Social Security rendered after a hearing to which they were a
party, within sixty days after notice of such decision or within such further
time as the Commissioner may allow.  *See* 42 U.S.C. § 405(g).

degenerative disease, and multiple sclerosis ("MS"), which
plaintiff contends rendered him disabled and unable to work
since September 15, 2010.  (*See* ECF No. 18, Administrative
Transcript, filed 7/10/2013 ("Tr."), at 163, 167.)  Presently
before the court is defendant's motion for judgment on the
pleadings.  For the reasons set forth below, defendant's motion
for judgment on the pleadings is denied and the case is remanded
for further proceedings consistent this opinion.

**BACKGROUND**

## I. Procedural History

Plaintiff applied for SSD and SSI on November 12,
2010, claiming he has been disabled since September 15, 2010.
(Tr. 163-72.)  The Social Security Administration initially
denied his application on February 11, 2011, and he requested a
hearing before an Administrative Law Judge on March 31, 2011.
(Tr. 146-53, 153-54.)  Plaintiff and his attorney, Valerie De
Peppo-Malloy, appeared before Administrative Law Judge Barry
Williams (the "ALJ") on November 8, 2011.  Plaintiff's mother,
Delilah Agostini, and vocational expert witness Andrew Pasternak
also testified at the hearing.  (Tr. 52-94.)  On December 5,
2011, the ALJ issued a decision finding that plaintiff was not
disabled within the meaning of the Act.  (Tr. 42-48.)
Specifically, the ALJ found that plaintiff had the ability to
perform light work, except that he could not climb ropes,

ladders, or scaffolds. (Tr. 45.) In a letter dated February 6, 2012, plaintiff sought review of the ALJ's decision by the Appeals Council. (Tr. 32-35.) The Appeals Council rejected the request based on untimely filing. (Tr. 27-30.) Plaintiff's attorney filed a statement of good cause for untimely filing by fax on May 3, 2012 (Tr. 11-26), and again by mail on May 23, 2012. (Tr. 7-10.) On February 14, 2013, the appeals council denied plaintiff's request for review, and the ALJ's decision became the final decision of the Commissioner. (Tr. 1-6.)

Plaintiff filed the instant action on March 22, 2013, alleging that he is entitled to SSD and SSI benefits due to his severe medical impairments, including MS and other nerve and joint pain, which plaintiff contends rendered him unable to work since June 29, 2011.[2] (*See* ECF No. 2, Complaint ("Compl."), filed 3/22/13.) Defendant moved for judgment on the pleadings on September 9, 2013. (*See* ECF No. 16, Notice of Motion for Judgment on the Pleadings, dated 9/9/2013; ECF No. 17, Memorandum of Law in Support of the Defendant's Motion for Judgment on the Pleadings, dated 9/9/2013 ("Def. Mem.").) Plaintiff did not file an opposition, despite having been served

---

[2] The onset date alleged in the Complaint, June 29, 2011, is later than the onset date alleged in the original Social Security benefits application, September 15, 2010. (*Compare* Compl. at 1 *with* Tr. at 163, 167.) The June 29, 2011 date corresponds to the time period when plaintiff was diagnosed with MS. (Complaint at 1-2.)

with notice of the Commissioner's motion on October 23, 2013. (ECF No. 15, Certificate of Service dated 10/23/2013.)

## II. Personal, Employment, and Non-Medical History

Plaintiff was born on October 26, 1967 and is a United States Citizen. (Tr. 163.) He has a GED and completed one semester of college, but has no specialized job or trade training. (Tr. 89, 200.) From approximately 1996 through 2000, plaintiff worked as a security guard. (Tr. 69-71.) He patrolled the premises of a medical establishment at night, on foot. (*Id.*) The job involved standing and walking for over six hours per day, but required no lifting. (*Id.*)

From 2000 through 2010, plaintiff worked in a variety of construction jobs. (Tr. 67-69, 200-01.) He carried equipment and other building materials weighing over 50 pounds on a regular basis, over distances of up to a few city blocks, and up or down as many as 7 flights of stairs. (Tr. 201.) He occasionally carried objects or materials weighing over 100 pounds. (*Id.*) This job required plaintiff to be on his feet for over six hours per day, and regularly required him to stoop, kneel, crouch, crawl, reach, and handle both large and small objects during the course of the day. (Tr. 68, 201.)

While employed in construction, plaintiff injured his knee in early January 2008. (Tr. 234.) This injury required surgery, but plaintiff was able to continue working in

4

construction after recuperating. (Tr. 229-42). Approximately
two years later, plaintiff was hit on the neck by a falling
sledgehammer while at work. (Tr. 252-53.) He finished work
that day, took a few days off, and then continued working for a
number of months. (*Id.*) On September 1, 2010, plaintiff was
laid off from his construction job due to the lack of available
work. (Tr. 180, 199, 253.)[3]

Plaintiff filed for disability on November 12, 2010,
reporting an alleged onset date of September 15, 2010. (Tr.
163-72.) In a disability report dated November 16, 2010,
plaintiff cited carpal tunnel syndrome ("CTS") and his knee
surgery ("meniscus replaced on right knee") as the conditions
limiting his ability to work. (Tr. 199.) A function report
(Tr. 206-15) dated December 15, 2010, completed by plaintiff's
mother on his behalf, reported pain in his neck, spine, and
hands, which he described as "numbness, stiff, tingling and
painful ache." (Tr. 207, 213.) Plaintiff stated that he took
multiple pain medications, and attended physical therapy three
times per week. (Tr. 202, 206, 214.)

---

[3] The disability deport appears to contain a typographical error in the answer
to question 4C, the date claimant stopped working. (Tr. 199.) Income
records and references to this date elsewhere in the record suggest claimant
was laid off on September 1, 2010, not the September 1, 2009 date listed in
the disability report.

Plaintiff described severe physical limitations in the December 15, 2010 function report. (Tr. 211-12.) He claimed that he could not walk or stand for long periods of time, and that even sitting for a long time was painful. (Tr. 211.) Plaintiff stated that he could only walk about twenty yards before he had to stop and rest for about ten minutes, could only climb stairs slowly, and could not squat or kneel at all. (Tr. 211-12.) He also reported limited ability to reach or lift without severe pain, and that he could not use his hands, which he described as being "the worst." (Tr. 211.) Plaintiff described his daily activities as showering, eating, attending physical therapy, feeding and walking his dog three times per day, watching television shows, and occasionally watching sports on television with his friends. (Tr. 206-10.) He reported difficulty with personal care, including pain when bathing, washing his hair, and shaving. (Tr. 207.) He relied on his mother for all household chores, including preparing meals, shopping, cleaning, and yard work. (Tr. 208-09.) Plaintiff also reported difficulty sleeping as a result of pain in his neck, spine, and hands. (Tr. 207.)

On March 31, 2011, after plaintiff's disability claim was denied, he requested a hearing with an ALJ. (Tr. 146, 152.) He filed an updated disability report for his appeal on April 6, 2011. (Tr. 218.) In the updated report, plaintiff described a

change in his condition, including an increase in numbness, stiffness, and pain in his back and neck. (*Id.*) He noted reduced function in personal hygiene activities, his ability to grip a steering wheel, and lifting or pulling objects. (Tr. 221.) Plaintiff also reported a new condition, severe depression, which he stated interfered his ability to sleep and concentrate. (Tr. 218.)

At a hearing before the ALJ on November 8, 2011, plaintiff testified about his carpal tunnel syndrome, his knee, neck, and back injuries, and his recent diagnosis of multiple sclerosis. (Tr. 71-79.) Plaintiff described his wrists and forearms as "tight and achy," preventing him from effectively using his hands. (Tr. 71-72.) He said he could pick up a can of soda, but could do little beyond that such as holding an iron or carrying groceries. (Tr. 79-80.) Plaintiff stated that he was in constant pain throughout his body, rating it an eight on a scale of ten, but could not differentiate the pain levels among different areas of his body. (Tr. 72, 74-75.) According to his testimony, pain medication combined with physical therapy helped the pain slightly but did not significantly reduce it. (Tr. 72-73.)

At the hearing, the ALJ entered plaintiff's diagnosis of MS into the record. (Tr. 57-61.) Plaintiff was diagnosed in June 2011 after being admitted to the hospital due to complete

vision loss in his right eye.  (Tr. 75-76.)  He testified that

his vision had since returned but was cloudy and not as "sharp"

as it had been.  (*Id.*)  Plaintiff also stated that his

physicians indicated that MS was, in fact, responsible for some

of the symptoms he had been suffering previously.  (Tr. 76-78.)

His primary health problems stemming from MS were severe pain

throughout his body and significant, constant fatigue.  (Tr.

77.)  Plaintiff reported that his mother cooked all of his meals

and performed household chores, and further stated that his

daily routine included a two-hour nap after physical therapy in

order to combat fatigue.  (Tr. 80-82.)  The testimony of

plaintiff's mother at the hearing also emphasized his inability

to perform routine daily activities.  (Tr. 82-84.)

## III. Summary of Medical History

Plaintiff's record of impairments begins with a knee

injury sustained in January of 2008, almost three years prior to

the alleged onset date of his disability.  (Tr. 234.)  Plaintiff

felt a "pop" in his right knee followed by pain, swelling, and

limited range of motion.  (*Id.*)  He saw orthopedic surgeon Dr.

Robert W. Verde on January 23, 2008.  (*Id.*)  The initial

examination showed mild effusion,[4] medial joint line tenderness,

---

[4] Effusion refers to swelling due to accumulation of fluid in the knee.  It
may result from trauma, overuse, or an underlying condition.  Effusion may
cause stiffness and pain in the affected joint (frequently the knee).  *See*
Mayo Clinic, Swollen Knee (2015), *available at*

and a "strongly positive" McMurray's test for a torn meniscus. (*Id.*) X-rays revealed no fracture, and plaintiff received an MRI, which resulted in a preliminary diagnosis of internal derangement[5] of the right knee. (Tr. 232.) Dr. Verde performed arthroscopic surgery on February 27, 2008 and repaired the torn medial meniscus. (Tr. 232, 237-38.) During the surgery, Dr. Verde also noted and attempted to treat synovitis[6] and grade II chondromalacia.[7] (Tr. 237-40.) Plaintiff returned to Dr. Verde for a follow-up appointment on June 5, 2008 for "improved" but "moderate" knee pain. (Tr. 230.) Dr. Verde sent plaintiff for a second MRI to rule out an additional, lateral meniscal tear. (Tr. 235-36.) At a second follow-up exam with Dr. Verde on June 19, 2008, plaintiff reported the pain was still improving and classified it as "mild." (Tr. 230.)

During the winter of 2009-2010 (the exact date is unspecified in the record), plaintiff suffered a work-related

---

http://www.mayoclinic.org/diseases-conditions/swollen-knee/basics/definition/con-20026072 (last visited February 5, 2016).

[5] Internal derangement of the knee is a non-specific term that simply refers to internal damage to the joint. *See* MDGuidelines.com, *Internal Derangement of Knee*, *available at* http://www.mdguidelines.com/internal-derangement-of-knee (last visited February 5, 2016).

[6] Synovitis refers to inflammation of the synovial membrane, which is the connective tissue lining the interior of joints. *See* MedicineNet.com, *Synovitis* (2012), *available at* http://www.medicinenet.com/script/main/art.asp?articlekey=5688 (last visited February 5, 2016).

[7] Chondromalacia is the "abnormal softening or degeneration of cartilage." *See* MedicineNet.com, *Chondromalacia* (2012), *available at* http://www.medicinenet.com/script/main/art.asp?articlekey=22765 (last visited February 5, 2016).

injury to his neck when he was struck by a falling sledgehammer. (Tr. 252-53.)  The record contains no evidence that plaintiff sought medical assistance at the time; he reported that he rested for a few days and returned to work.  (*Id.*)

Plaintiff saw Dr. Shan Nagendra of South Shore Rehabilitation for a consultation on November 10, 2010.  He complained of back, neck, and hand pain, with paresthesia[8] of the hands.  (Tr. 289.)  Dr. Nagendra noted abnormal range of motion and tenderness in the lumbar region.  (Tr. 290.)  Plaintiff's wrists, hands, and fingers demonstrated normal range of motion and were negative for tenderness.  (*Id.*)  Plaintiff's knees and shoulders displayed normal range of motion and no tenderness. (*Id.*)  Dr. Nagendra also conducted a neurological examination, which was normal, with the patient receiving a 5/5 score for his motor evaluation.  (*Id.*)  Plaintiff's gait was within normal limits.  (Tr. 291.)  Dr. Nagendra diagnosed plaintiff with cervical and lumbar spine derangement and referred him to a physical therapist.  (*Id.*)  Plaintiff subsequently attended physical therapy at South Shore Rehabilitation from November 10, 2010 to February 7, 2011.  (Tr. 299-301.)

---

[8] Paresthesia is defined as "a burning or prickling sensation that is usually felt in the hands, arms, legs, or feet ... [c]hronic paresthesia is often a symptom of an underlying neurological disease or traumatic nerve damage." *See* National Institute of Neurological Disorders and Stroke, *Paresthesia*, *available at* http://www.ninds.nih.gov/disorders/paresthesia/paresthesia.htm (last visited February 5, 2016).

On November 24, 2010, plaintiff returned to North Shore Orthopedics for a follow-up examination with Dr. Nagendra, which revealed no new symptoms.  (Tr. 286.)  Plaintiff also underwent nerve conduction velocity studies of the upper extremities that indicated "bilaterial segmental median neuropathy (i.e., carpal tunnel syndrome)" and left cervical radiculopathy at the C5-C6 level.  (Tr. 284.)

On December 8, 2010, plaintiff saw Dr. Nagendra for another follow-up examination. (Tr. 274.)  Dr. Nagendra's findings were consistent with those in November 2010.  (Tr. 272, 274.)

Plaintiff returned to South Shore Rehabilitation on January 7, 2011, this time for a neurological examination with Dr. Edward J. Levine, a neurologist who was seeing plaintiff three times per week for physical therapy.  (Tr. 271, 273.)  Dr. Levine noted tenderness and spasm in the lumbar region with abnormal lumbar ranges of motion.  (Tr. 271.)  He diagnosed lumbrosacral radiculopathy[9] and recommended continued physical therapy.  (Tr. 273.)

---

[9] Radiculopathy, also known as radiculitis, refers to "any disease of the spinal nerve roots and spinal nerves."  *See* MedicineNet.com, Radiculopathy, *available at* http://www.medicinenet.com/script/main/art.asp?articlekey=14161 (last visited February 5, 2016).  It is most common in the lumbar and cervical regions of the spine, and may "cause pain, numbness, tingling, or weakness."  *See id.*, Radiculopathy facts, *available at* http://www.medicinenet.com/radiculopathy/article.htm (last visited February, 2016).

On January 24, 2011, plaintiff visited Dr. Sujit Chakrabarti of Brook Island Medical Associates for a consultative exam that included orthopedic testing and x-rays of the spine. (Tr. 252-59.) Plaintiff explained that he suffered a neck injury at work at year earlier, and reported experiencing numbness and tingling in his hands for the past five to six months. (Tr. 252.) He further reported the ability to sleep without difficulty, drive a car, and lift 4-5 pounds, but reported that his mother and sister completed all household chores. (Tr. 253.) In his physical examination, Dr. Chakrabarti noted that plaintiff was "not in agony" and "filled out the paperwork with ease." (Tr. 254.) His finger dexterity was "good" with "perfect" motor function and "good" grip. (*Id.*) His gait was completely normal, with a normal heel toe stride. (*Id.*) Plaintiff's ability to squat was limited, but he could "go more than halfway down." (*Id.*) Dr. Chakrabarti did find some issues with range of motion in the cervical and lumbar area, similar to the assessments of Drs. Nagendra and Levine. (Tr. 254; 267-301.) Dr. Chakrabarti also noted "some impairment" of the strength of plaintiff's fourth and fifth fingers, and signs of "mild impaired sensation of the forearm." (Tr. 254.) Dr. Chakrabarti's initial impression was "possible radiculopathy of the cervical neck," with a "guarded" prognosis pending MRI exams and full diagnosis. (Tr. 255.)

Cervical spine x-rays taken January 25, 2011 showed disc spaces were preserved, vertebral height and alignment were maintained, and no focal bony abnormality. (Tr. 259.) Lumbar spine x-rays showed no bony abnormality and vertebral height and alignment were maintained. (*Id.*)

Beginning March 15, 2011, plaintiff received regular treatment from Dr. Ida Altshuler of the Staten Island Physician Practice. (Tr. 107-15, 330-48.) Plaintiff's medical history, taken during his first appointment with Dr. Altshuler, cites back, neck, and hand pain similar to that reported to Drs. Nagendra and Chakrabarti. (Tr. 330; *see generally* Tr. 252-59, 267-98.) Plaintiff reported radiation of "moderate" pain from his neck to his arms and hands. (Tr. 330.) Dr. Altshuler's initial physical exam found restricted range of motion, muscle spasms, and "mild pain" in plaintiff's cervical and lumbar regions. (Tr. 332.) His grip was rated a "5-/5," his balance and gait were described as "intact," with normal fine motor skills. (Tr. 332-33.) Dr. Altshuler's initial diagnosis was neck pain, low back pain, and radiculitis in the upper arms. (Tr. 333.) She sent plaintiff for an MRI (Tr. 334-37), which showed "mild degenerative changes in C[ervical] and L[umbar] spine with mild foramina[l] narrowing"[10] in the cervical and

---

[10] Narrowing in the foramen of the spine, known as spinal stenosis, "can cause pain, numbness, muscle weakness, and problems with bladder or bowel function" and "is most commonly caused by wear-and-tear changes in the spine related to

lumbar areas. (Tr. 335) Dr. Altshuler referred plaintiff to
Dr. Isaac Kreizman for physical therapy and diagnostic testing.
(Tr. 333.)

On April 12, 2011, plaintiff returned to Dr. Altshuler
and described his neck pain as "severe," and his back pain as
"persistent" and "fluctuating." (Tr. 338.) Dr. Altshuler
specifically noted numbness, pain, and paresthesia in the
extremities. (Tr. 339.) Grip, gait, and fine motor skills were
all normal, and plaintiff was negative for fatigue. (Tr. 338-
39.) Dr. Altshuler again referred plaintiff to Dr. Kreizman,
this time for pain management. (Tr. 340.)

Plaintiff next saw Dr. Altshuler on May 17, 2011.
(Tr. 341-43.) He reported that his back pain had radiated to
the legs. (Tr. 341.) Although plaintiff showed no
psychological symptoms during his first two visits to Dr.
Altshuler, his psychiatric evaluation for the May 17, 2011 visit
was positive for depression and "psychiatric symptoms." (Tr.
342.) Dr. Altshuler diagnosed lower back pain and noted
plaintiff's depression was a psychological factor that "can
exacerbate pain." (Tr. 343.) She also diagnosed neck pain,
radiculitis in the upper limbs, cervical disc degeneration, and

---

aging." *See* Mayo Clinic, *Spinal Stenosis* (2015), *available at*
http://www.mayoclinic.org/diseases-conditions/spinal-
stenosis/basics/definition/con-20036105 (last visited February 5, 2016).

lumbar/lumbrosacral degenerative disc. (*Id.*) She prescribed Remeron, Neurontin, Tramadol, and Soma and ordered neurologic testing and pain management consultation. (*Id.*)

On June 2, 2011, Dr. Raul Sala conducted EMG/NCV testing of plaintiff's upper and lower extremities. (Tr. 344-47.) Test results were consistent with bilateral L4-L5-S1 radiculopathy in the lower extremities and bilateral C5-C6-C7 radiculopathy in the upper extremities. (Tr. 345.)

Plaintiff visited Staten Island Physician Practice on June 28, 2011 and reported that he had experienced cloudy vision in his right eye for three days. (Tr. 319-20.) He was seen by an ophthalmologist, Dr. Robert Caro, who diagnosed papilledema[11] of the right eye and hyperopic astigmatism of the left eye. (Tr. 326.) An MRI taken that day was normal except for mild white matter disease[12] and chronic sinusitis. (Tr. 327.) The radiologist noted that white matter disease was a "nonspecific finding" that could result from a variety of ailments, including diabetes, hypertension, and Lyme disease. (*Id.*)

---

[11] Papilledema is swelling of the optic nerve and the optic disk caused by increased intracranial pressure. *See* McGraw-Hill Concise Dictionary of Modern Medicine, *Papilledema* (2002), *available at http://medical-dictionary.thefreedictionary.com/papilledema* (last visited February 5, 2016).

[12] White matter disease refers to "a progressive disorder caused by age related decline in the part of the nerves (the white matter) that connect different areas of the brain to each other and to the spinal cord." *See* American Physical Therapy Association, Section on Neurology, *White Matter Disease*, *available at* http://www.neuropt.org/docs/vsig-english-pt-fact-sheets/white-matter-disease.pdf?sfvrsn=2 (last visited February 5, 2016).

Dr. Altshuler saw plaintiff on June 30, 2011. (Tr. 107-09.) Plaintiff reported that he had lost vision in his right eye four days earlier and was experiencing lower back pain, neck pain, and numbness and paresthesia in his hands and feet. (Tr. 107.) Dr. Altshuler found plaintiff's gait and fine motor skills to be intact, but downgraded plaintiff's grip to "4/5" from "5-/5" on his previous visit. (Tr. 108.) She also noted C6-C7 hypoesthesia bilaterally. (*Id.*) Dr. Altshuler diagnosed plaintiff with multiple sclerosis on this visit. (Tr. 109.) She also diagnosed optic neuritis, lower back pain, neck pain, radiculitis upper limbs, and radiculitis lower limbs. (*Id.*)

On July 26, 2011, plaintiff again saw Dr. Altshuler, who described him as suffering from "probable" relapsing-remitting multiple sclerosis[13] that caused fatigue, numbness, radiculitis, difficulty picking up objects, and some vision loss ("improving, but not back to NL [Normal Level]"). (Tr. 110.) The physical examination revealed focal weakness, numbness in

---

[13] Relapsing-Remitting MS, (the most common form of the disease), presents with symptoms that flare up in the relapse period, followed by periods of remission in which few or no symptoms are present. Relapse is more frequent in early stages of the disease, though remission may last days, weeks, or even months. *See* WebMD.com, *Multiple Sclerosis* (2015) *available at*, http://www.webmd.com/multiple-sclerosis/guide/relapsing-remitting-multiple-sclerosis (last visited February 5, 2016); PubMed Health, Management of Relapsing-Remitting Multiple Sclerosis, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0060855/ (last visited February 5, 2016).

the extremities, and reduced grip ("4/5").  (Tr. 111.)
Plaintiff's gait and fine motor skills were normal, and he was
negative for fatigue.  (*Id.*)  Dr. Altshuler started plaintiff on
injections of Avonex to treat the multiple sclerosis and
continued prescriptions for Remeron, Neurontin, Tramadol, and
Soma.  (Tr. 112.)

On August 25, 2011, plaintiff visited Dr. Caro for a
comprehensive eye examination.  (Tr. 101.)  Plaintiff reported
that vision in his right eye was improved but "slightly blurry."
(*Id.*)  The eye examination revealed that right eye visual acuity
was 20/40 uncorrected and 20/30 with correction.  (Tr. 102.)
Left eye visual acuity was 20/20 without correction.  (*Id.*)  Dr.
Caro diagnosed resolved papilledema in the right eye and
instructed plaintiff to return in six months.  (Tr. 104.)

On September 26, 2011, Dr. Altshuler confirmed the
diagnosis of relapsing-remitting multiple sclerosis.  (Tr. 113.)
The results of plaintiff's physical exam were unchanged from the
previous examination in July 2011, with notable positives for
focal weakness, paresthesia, and reduced grip, and normal
fatigue levels, fine motor skills, and gait.  (Tr. 114.)  Dr.
Altshuler continued plaintiff's treatment with Avonex, Remeron,
Neurontin, Tramadol, and Soma.  (*Id.*)

## IV. Cooperative Disability Investigation Report

As part of plaintiff's disability benefits
application, an agent from the New York Cooperative Disability
Investigations Unit ("CDI") observed plaintiff "to determine the
accurate level of his functioning." (Tr. 261-66.) New York
State Investigator Kevin R. McCann conducted surveillance of the
plaintiff on January 24, 2011. (Tr. 264.) Surveillance began
at the plaintiff's residence around 9 a.m., and continued as
plaintiff traveled to two medical appointments on Staten Island.
(Tr. 264-65.)

The CDI investigator observed plaintiff opening the
door to his car with a key and pulling the car up to his
residence to allow his mother into the front passenger seat.
(*Id.*) Plaintiff drove for approximately 30-40 minutes to the
site of his appointment. (*Id.*) After parking on the street, he
walked one block to a medical office while putting on his gloves
and closing his jacket. (Tr. 265.) The investigator noted that
plaintiff walked "considerably ahead and faster than his
mother," and held the door for her. (*Id.*) The investigator
later followed plaintiff to a second medical appointment and
observed that plaintiff drove to the appointment, parked on the
street, and walked into the medical office. (*Id.*) The
investigator noted that during his surveillance, plaintiff's
gait appeared normal, he walked considerable distances without

resting, used his fingers and hands without difficulty, and did not exhibit any obvious signs of pain, fatigue, or restricted movement.  (*Id.*)

## V.  Summary of the Vocational Expert's Testimony

Andrew Pasternak, a vocational expert, testified at plaintiff's November 8, 2011 hearing before the ALJ.  (Tr. 84-93.)  Mr. Pasternak testified that plaintiff previously worked as a security guard (a semi-skilled job classified as "light work"), and as a construction worker (an unskilled job classified as "very heavy" work based on plaintiff's testimony regarding his daily activities).  (Tr. 86-87.)

The ALJ asked the vocational expert a series of hypotheticals regarding whether a claimant with plaintiff's background, education, and work experience would be capable of medium, light, or sedentary work.  For each hypothetical, the ALJ asked the vocational expert to assume the job required: occasional climbing of stairs and ramps; no climbing of ladders, ropes, or scaffolds; and occasional stooping, kneeling, crouching, crawling, balancing and pushing/pulling from left to right.  (Tr. 89-93.)  Given a hypothetical claimant capable of medium work, Mr. Pasternak testified that that person would not be able to perform a construction job, but could work as a security guard.  (Tr. 89.)  He testified that such a person could also work as a "hand packager," a "bus person," and a

"warehouse worker." (Tr. 90.) Given a hypothetical claimant
capable of light work, Mr. Pasternak testified that the
individual could perform as a security guard (i.e., plaintiff's
past job), a cashier, a fast-food worker, and a "general clerk."
(Tr. 91.) Given a third hypothetical claimant, this time
capable only of sedentary work with much more severe
restrictions on physical motion (only occasional ability to
reach forward and to the sides, difficulty grasping objects) Mr.
Pasternak testified that such an individual would not be able to
perform any of plaintiff's past work, or most jobs in the local
and national economy. (Tr. 92-93.)

## VI. The ALJ's December 5, 2011 Opinion

On December 5, 2011, the ALJ issued an opinion finding
that plaintiff was not disabled within the meaning of the Act.
(Tr. 42-48.) The ALJ used the five-step analysis set forth in
Social Security Administration Regulations (the "Regulations")
at 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4). (Tr. 43.)

At step one, the ALJ found that plaintiff had not
engaged in substantial gainful activity since his alleged onset
date, September 15, 2010. (Tr. 44.) At step two, the ALJ found
that plaintiff had severe impairments, including carpal tunnel
syndrome, major dysfunction of a joint, cervical and lumbar
degenerative disease, and multiple sclerosis, which "could have
more than a minimal effect on the claimant's ability to perform

20

basic work." (*Id.*)  At step three, the ALJ found that
plaintiff's impairments, as they were described in his medical
records, did not meet or medically equal the severity of one of
the listed impairments of Appendix 1 of the regulations that
would conclusively require a disability determination.  (Tr.
45.)  The ALJ specifically considered medical listings 1.02
(dysfunction of the joint), 1.04 (disorders of the spine), and
11.09 (MS).  (*Id.*)  At step four, the ALJ found that plaintiff
had:

> the residual functional capacity ("RFC"), to
> perform light work as defined in 20 C.F.R.
> 404.1567(b) and 416.967(b) except that he is
> unable to climb ladders, ropes, or scaffolds, can
> occasionally climb ramps or stairs, occasionally
> balance, stoop, kneel, crouch, and crawl, can
> occasionally reach bilaterally, forward and to
> the side and can occasionally reach bilaterally
> overhead.

(*Id.*)  The ALJ then found plaintiff was capable of performing
his past relevant work as a security guard and thus was not
disabled within the meaning of the Act.  (Tr. 47.)

In finding plaintiff had the RFC to perform light
work, the ALJ concluded that his allegations of debilitating
pain and extensive functional limitations were not fully
supported by the medical evidence in the record.  (Tr. 45-47.)
The ALJ relied on a two-step process in assessing plaintiff's
claimed symptoms.  (Tr. 45; *see also* 20 C.F.R. § 404.1529(a).)
First, the ALJ assessed whether plaintiff suffered from an

"underlying medically determinable physical or mental impairment
. . . shown by medically acceptable clinical techniques . . .
that could reasonably be expected to produce the claimant's pain
or other symptoms."  (Tr. 45-46.)  He found that plaintiff's
impairments, described at step two of the five-step analysis,
"could reasonably be expected to cause the alleged symptoms."
(Tr. 46.)

Second, the ALJ considered plaintiff's statements
regarding the intensity of his symptoms.  He then "evaluate[d]
the intensity, persistence, and limiting effects of the
claimant's symptoms," and whether such claims were
"substantiated by objective medical evidence."  (Tr. 46.)  The
ALJ found that plaintiff's statements were "not credible" to the
extent that they were inconsistent with the RFC assessment
indicating plaintiff's fitness for light work.  He concluded
that "the evidence does not support the alleged extent of
[plaintiff's] limitations."  (*Id.*)

In reaching his credibility findings, the ALJ assessed
plaintiff's impairments and the related medical evidence.  (*See
Id.* at 45-47.)  With respect to the cervical and lumbar issues
identified by Drs. Nagendra and Levine, the ALJ noted that
despite limited range of motion and spasms, plaintiff's physical
exams also "revealed normal sensory and motor evaluations."
(*Id.*)  He further noted that aside from CTS and radiculopathy,

nerve conduction studies revealed "no other neurological deficits," surgery was not recommended, and "X-ray of the lumbar and cervical spines were essentially normal." (*Id.*) The ALJ also considered the consultative examination of Dr. Chakrabarti, stating that although plaintiff showed impaired sensation in the forearm and wrists, he filled out forms without agony, showed good finger dexterity and grip, and "fairly normal" neck movement. (*Id.*)

The ALJ next considered the January 2011 CDI investigation and plaintiff's observed ability to use his fingers, wrists, and hands and walk a considerable distance without obvious pain, fatigue, or restriction of movement. (Tr. 47.) Turning to plaintiff's June 2011 treatment records, the ALJ noted an MRI revealed mild white matter disease but observed "that no positive findings were noted on neuro/psychiatric or musculoskeletal examination other than mild pain with motion and muscle spasm." (*Id.*) Finally, the ALJ acknowledged plaintiff's diagnosis of MS but did not lend it any significant weight, stating only that he "considered this diagnosis and the resulting limitations in the residual functional capacity." (*Id.*)

## VII. Medical Records for the Period After the ALJ's Decision

The Administrative Transcript contains certain records submitted as part of plaintiff's appeal of the ALJ's decision.

(*See* Tr. at 38, 352-56.)  These records include: a letter to the
Appeals Counsel dated January 30, 2012 from plaintiff's sister,
a registered nurse, detailing her impression that plaintiff's MS
had worsened, his depressed immune system resulted in a skin
condition (impetigo), and weekly Avonex injections caused
recurring flu-like symptoms (Tr. 38); a letter from Dr. Kreizman
dated January 16, 2012 stating that plaintiff's MS caused pain
and fatigue rendering him unable to work (Tr. 352); and a record
from plaintiff's January 26, 2012 appointment with Dr.
Altshuler, which states that plaintiff suffered from depression
and anxiety that were likely contributing to plaintiff's
symptoms.  (Tr. 354-55.)  These records all post-date the ALJ's
December 5, 2011 decision and therefore are not relevant to the
period for which benefits were denied.  *See Perez v. Chater*, 77
F.3d 41, 45 (2d Cir. 1996) (medical records provided to the
Appeals Council after the ALJ has denied benefits will be
considered as long as the records relate to the period of time
covered by the ALJ's decision.)  To the extent the documents
discuss findings already considered by the ALJ, they do not
materially affect the ALJ's determination based on substantial
evidence.

## VIII. Medical Records Attached to the Complaint

Additionally, upon filing the Complaint, plaintiff
attached 443 pages of documents as exhibits.  (*See* ECF Nos. 2-1

to 2-45.)  Most of these documents are medical records that were part of plaintiff's original application for benefits, and were included in the Administrative Transcript.  Other records post-date the ALJ's December 5, 2011 decision and detail treatment for back and neck pain that occurred after the ALJ's decision.

Some records, however, pertain to the relevant period but were not included in the Administrative Transcript. Plaintiff saw Dr. Kreizman on a monthly basis from January 4, 2011 to November 30, 2011.  (*See* ECF Nos. 2-40 to 2-45.)  The records from those visits reflect that plaintiff consistently complained of significant neck and lower back pain, difficulty bending and sitting, and fatigue due to MS.  (*See, e.g.*, ECF No. 2-41 to 2-42.)  Dr. Kreizman diagnosed plaintiff with a gait disorder and discerned tenderness and reduced ranges of motion in the cervical and lumbar spines.  (*Id.*)  He prescribed a treatment regimen of physical therapy and pain medication, including narcotics (Percocet).  (*Id.*)

Finally, plaintiff attached a letter from Dr. Levine dated March 7, 2011 stating plaintiff "remains completely disabled until further evaluations."  (ECF No. 2-5 at 11.)

## Discussion

### I.  Standard of Review

The court does not engage in *de novo* determination of the plaintiff's disability status, but instead assesses whether

(1) the proper legal standards for the determination of disability were applied, and (2) whether there was substantial evidence in the record to support the administrative findings of fact. *See* 42 U.S.C. § 405(g); *Parker v. Harris*, 626 F.2d 225, 231 (2d Cir. 1980). The court may only set aside the Commissioner's determination if the decision of the ALJ fails to adhere to one of the aforementioned requirements. *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013); *see also* 42 U.S.C. § 405(g).

In order to properly assess the legal standards and evidentiary support in the ALJ's disability decision, the court must be sure that the ALJ considered all of the evidence available. *Sutherland v. Barnhart*, 322 F. Supp. 2d 282, 289 (E.D.N.Y. 2004) ("Factual determinations, based on the weighing of evidence, are within the ALJ's competence; however, in making these determinations, the ALJ must address the evidence on the record . . . the ALJ's failure to mention several parts of the record which contradict his conclusion constitutes error.").

The court may remand a disability decision for further proceedings at the administrative level. *See* 42 U.S.C. § 405(g). Remand for development of evidence or more specific findings is particularly appropriate where there are gaps in the administrative record or where further findings or explanation

may clarify the ALJ's rationale.  *See Grace v. Astrue*, 2013 WL
4010271, at *14 (S.D.N.Y. July 31, 2013).

### A.   Legal Standards Governing the Commissioner's Determination of Eligibility to Receive Benefits

To be eligible for Social Security benefits, an
individual must meet basic requirements of duration and
severity, demonstrable by medical evidence.  *See* 42 U.S.C.
§ 423(d).  First, the plaintiff's impairment must be "of such
severity that he is not only unable to do his previous work but
cannot, considering his age, education, and work experience,
engage in any other kind of substantial gainful work which
exists in the national economy[.]"  42 U.S.C. § 423(d)(2)(A).
If there are multiple impairments, it is their combined effect
that must be considered, not their individual severity.  42
U.S.C. § 423(d)(2)(B).  The impairment must be one "which has
lasted or can be expected to last for a continuous period of not
less than 12 months[.]"  42 U.S.C. § 423(d)(1)(A).  Individual
statements regarding disability are insufficient — a claimant
must furnish "such medical and other evidence of the existence
[of the disability] as the Commissioner of Social Security may
require."  42 U.S.C. § 423(d)(5)(A).

### 1.   The Commissioner's Five-Step Analysis for Determining Whether a Claimant is Disabled Under the Act

SSA regulations dictate a 5-step process to be used in evaluating disability. *See* 20 C.F.R. § 404.1520(a)(4). "In essence, if the Commissioner determines (1) that the claimant is not working, (2) that he has a 'severe impairment,' (3) that the impairment is not one that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in his prior type of work, the Commissioner must find him disabled if (5) there is not another type of work the claimant can do." *Draegert v. Barnart*, 311 F.3d 468, 472 (2d Cir. 2002). Step four requires the ALJ to determine the claimant's Residual Functional Capacity ("RFC"), which is "the most you can still do despite you limitations." 20 C.F.R. § 404.1520(a). The burden of proof rests on the plaintiff at steps one through four, but switches to the ALJ at step 5 to show that work exists in the national economy that the claimant can perform. *See Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009).

## 2. The ALJ's Affirmative Duty to Develop the Record

The ALJ's burden to affirmatively develop the record in a Social Security decision derives from SSA regulations, instructing that "every reasonable effort" should be made to develop a "complete medical history." 20 C.F.R. § 404.1512(d). Courts have expanded on this, explaining that beneficent purpose, inclusive intent, and the non-adversarial nature of the

28

Social Security process requires additional judicial attention. *Cutler v. Weinberger*, 516 F.2d 1282, 1285 (2d Cir. 1975); *Marcus v. Califano*, 615 F.2d 23, 29 (2d Cir. 1979); *Pratts v. Chater*, 94 F.3d 34, 38 (2d Cir. 1996). This burden exists regardless of whether the claimant is represented by counsel. *Pratts*, 94 F.3d at 38. As a result, if any area of the plaintiff's medical record is inadequate, it is the ALJ's duty to seek additional information from the treating physicians. *Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998); *Kilkenny v. Astrue*, No. 05-CV-6507, 2009 WL 1321692, at *15 (S.D.N.Y. May 12, 2009) ("Part of an ALJ's responsibility is to ensure that a claimant's complete medical history is accounted for.")

### 3. Emerging Impairments

A Social Security claim remains open until the Commissioner makes a final determination on the application. 20 C.F.R. § 416.330; *see Bastien v. Califano*, 572 F.2d 908, 912 (2d Cir. 1978) ("A claimant will prevail if he can show that he became disabled at any time up to the date of decision."). The burden to show new impairments or grounds for disability remains with the claimant, but the ALJ is not relieved of his or her affirmative duty to develop the record. *Kilkenny*, 2009 WL 1321692 at *13. When faced with new information relevant to a plaintiff's disability, the ALJ must develop the record prior to issuing a decision. *See id.* at *15 ("It is not proper for the

ALJ to simply pick and choose from the transcript only such
evidence that supports his [or her] determination, without
affording consideration to the evidence supporting the
plaintiff's claims.  It is grounds for remand for the ALJ to
ignore parts of the record that are probative of the claimant's
disability claim.").

### 4.  Two-Step Process for Assessing Subjective Symptoms Contributing to Disability

Subjective symptoms, including pain and fatigue, may
be a factor in assessing disability and calculating a claimant's
RFC.  *Chickocki v. Astrue*, 534 Fed. App'x 71, 75 (2d Cir. 2013).
However, there must be some objective medical findings able to
support the allegations.  20 C.F.R. ¶¶ 404.1529, 416.929; SSR
96–7p, 1996 WL 374186, at *4 (July 2, 1996); *see Meadors v.
Astrue*, No. 09-3545-CV, 2010 WL 1048824, at *183 (2d Cir. Mar.
23, 2010); *Snell v. Apfel*, 177 F.3d 128, 135 (2d Cir. 1999).
When claimant's testimony and evidence are conflicting, a two-
step evaluation must be followed.  *See* 20 C.F.R. ¶¶ 404.1529,
416.929; SSR 96-7P; *see Meadors*, 2010 WL 1048824, at *183.
First, the claimant must have an underlying impairment that
could cause the alleged symptoms.  20 C.F.R. ¶¶ 404.1529(b),
416.929(b).  If so, "the ALJ must evaluate the intensity and
persistence of those symptoms considering all of the available
evidence; and, to the extent that the claimant's pain

contentions are not substantiated by the objective medical
evidence, the ALJ must engage in a credibility inquiry."
*Meadors*, 2010 WL 1048824 at \*183; *see also* 20 C.F.R. ¶¶
404.1529(b), 416.929(b).

In making a credibility assessment, the ALJ should
consider:

> (i) [The claimant's] daily activities; (ii) The
> location, duration, frequency, and intensity of
> [claimant's] pain or other symptoms;(iii)
> Precipitating and aggravating factors;(iv) The type,
> dosage, effectiveness, and side effects of any
> medication [claimant] take[s] or ha[s] taken to
> alleviate [claimant's] pain or other symptoms; (v)
> Treatment, other than medication, [claimant]
> receive[s] or ha[s] received for relief of
> [claimant's] pain or other symptoms; (vi) Any measures
> [claimant] use[s] or ha[s] used to relieve
> [claimant's] pain or other symptoms . . . ; and (vii)
> Other factors concerning [claimant's] functional
> limitations and restrictions due to pain or other
> symptoms.

20 C.F.R. § 404.1529(c)(3)(i-vii). The ALJ's decision "must
contain specific reasons for the finding on credibility,
supported by the evidence in the case record, and must be
sufficiently specific to make clear to the individual and to any
subsequent reviewers the weight the adjudicator gave to the
individual's statements and the reasons for that weight." SSR
96-7P at \*4; *see Chickori*, 534 Fed. App'x at 76. The lack of
substantial detail in the ALJ's assessment will not require
remand as long as the "the evidence of record permits [the
court] to glean the rationale of an ALJ's decision." *Chickori*,

31

534 Fed App'x at 76 (quoting *Mongeur v. Heckler*, 722 F.2d 1033,
1040 (2d Cir. 1983)) (internal quotation marks omitted).
Credibility determinations by the ALJ are, like the overall
decision on disability, given deference provided that they are
based on substantial evidence.  *Vargas v. Astrue*, 2011 WL
2946371, at *15 (S.D.N.Y. Jul. 20, 2011) (citing *Aponte v.
Sec'y, Dep't of Health and Human Servs. of U.S.*, 728 F.2d 588
(2d Cir. 1984)).

> **B.    Substantial Evidence Standard**

"In reviewing a final decision of the Commissioner, a
district court must determine whether the correct legal
standards were applied and whether substantial evidence supports
the decision."  *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir.
2004).  Substantial evidence is "more than a mere scintilla.  It
means such relevant evidence as a reasonable mind might accept
as adequate to support a conclusion."  *Richardson v. Perales*,
402 U.S. 389, 402 (1971) (internal quotation marks omitted).
For Social Security claims, evidence must be substantial not on
its own, but in the context of the full, complete record.
*McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014).

## II. Application

### A. Improper Application of the Procedure for Assessing the Credibility of Plaintiff's Pain and Fatigue Symptoms.

The court finds that the ALJ erred by failing to properly assess plaintiff's subjective complaints of debilitating pain and fatigue before discounting them. In applying the two-step procedure for assessing subjective symptoms, the ALJ first found that plaintiff's "medically determinable impairments" could cause his alleged symptoms. (Tr. at 46.) At the second step, determining the credibility of plaintiff's claims based on a consideration of the entire case record, the ALJ found plaintiff's statements regarding his pain and fatigue "not credible." (Tr. 46.) The ALJ did not, however, explain why he disregarded plaintiff's testimony regarding "constant fatigue and pain" and its effect on his ability to function. Instead, the ALJ made brief reference to plaintiff's ability to complete certain activities of daily living and the CDI investigator's observation that plaintiff could walk to his medical appointments on January 27, 2011 - approximately seven months before plaintiff's MS diagnosis. (Tr. 47.) Notably, two of plaintiff's treating physicians, Dr. Altshuler and Dr. Kreizman, never questioned the credibility of the plaintiff's complaints of severe pain.

Furthermore, the ALJ did not address plaintiff's depression and anxiety as possible factors aggravating his subjective experience of pain. Plaintiff noted his "severe" depression on the record in his updated disability report dated April 6, 2011. (Tr. at 218.) Additionally, Dr. Altshuler diagnosed possible depression in her May 17, 2011 exam and suggested that depression could be exacerbating plaintiff's pain. (Tr. 342-43.)

In *Janas v. Barnhart*, the court remanded for procedural error based in part on a credibility determination where, as here, the ALJ failed to address a probative combination of facts: (1) no treating physician questioned the claimant's credibility regarding pain levels; (2) pain medications, including narcotics, were prescribed; and (3) a treating physician suggested psychological factors exacerbated the claimant's pain. 451 F. Supp. 2d 483, 502 (W.D.N.Y. 2006) (finding it "significant that no treating physician ever questioned plaintiff's credibility regarding her complaints of pain and discomfort, for which Plaintiff was prescribed pain relief medications, including narcotics" and that the treating physician suggestions of a psychological component "gives credence to the plaintiff's pain allegations.")

Even if the ALJ had considered plaintiff's testimony in assessing the severity of his mental impairments, the ALJ did

not consider most of the factors listed in 20 C.F.R §
404.1529(c),[14] which an ALJ must address when a claimant's
professed symptoms demonstrate a greater degree of severity of
impairment than what the objective medical evidence shows on its
own. *See Alcantara v. Astrue*, 667 F. Supp. 2d 262, 277
(S.D.N.Y. 2009) (internal citations and quotation marks
omitted). Absent the requisite findings of the specific reasons
for the ALJ's credibility determination, remand is required.

**B. Medical Records Provided to the Court Should Be Considered on Remand to the Extent They Relate to the Period Covered by the ALJ's Decision.**

The court "may at any time order additional evidence
to be taken before the Commissioner of Social Security, but only
upon a showing that there is new evidence which is material and
that there is good cause for the failure to incorporate such
evidence into the record in a prior proceeding[.]" 42 U.S.C. §
405(g). In seeking remand, the Second Circuit requires a
plaintiff to show that the proffered evidence is:

> (1) new and not merely cumulative of what is
> already in the record, and that it is (2)
> material, that is, both relevant to the
> claimant's condition during the time period for
> which benefits were denied and probative. The
> concept of materiality requires, in addition, a
> reasonable possibility that the new evidence
> would have influenced the Secretary to decide
> claimant's application differently. Finally,

---

[14] The ALJ did consider certain activities of daily living that plaintiff
reported the ability to complete. (Tr. 47.)

> claimant must show (3) good cause for her failure
> to present the evidence earlier.

*Tirado v. Bowen*, 842 F.2d 595, 597 (2d Cir. 1988) (internal

quotations and citations omitted).

"To show good cause, [the claimant] must adequately

explain [his] failure to incorporate the proffered evidence into

the administrative record." *Lisa v. Sec'y of Dep't of Health &*

*Human Servs. of U.S.*, 940 F.2d 40, 45 (2d Cir.1991) (citations

omitted). "Good cause" may be found where new evidence emerges

after the close of administrative proceedings, or where there

was confusion during the ALJ hearing process regarding what

documents had been received by the office. *See, e.g., Tolany v.*

*Heckler*, 756 F.2d 268, 272 (2d Cir. 1985) (finding good cause

where recent evaluation resulted in a new diagnosis); *see also*

*Jefferson v. Astrue*, No. 3:06 CV 1729, 2008 WL 918473 (D. Conn.

Mar. 11, 2008) (finding good cause where there was confusion

about what documents had been submitted to the hearing office).

Additionally, where evidence is new and material, it is possible

that good cause may be excused where the ALJ has failed to

affirmatively act to develop the record. *See, e.g., Brown v.*

*Colvin*, No. 13-CV-8934, 2015 WL 3385845, at *8-9 (S.D.N.Y. May

26, 2015) (citing the three-part test, then finding the evidence

new and material, and finding that the ALJ committed a

procedural error by failing to develop the record).

Applying the 3-part test under *Tirado*, the court finds that, on remand, the ALJ must consider medical records that relate to the relevant period but were not included in the Administrative Transcript.  First, the documents are new and not cumulative – the Administrative Transcript contained no records related to Dr. Kreizman's pain management regimen from May 11, 2010 to November 30, 2011.  Second, the documents are certainly relevant and probative given the centrality of plaintiff's allegations of severe pain to his RFC and thus his disability status.  Third, although defendant argues that plaintiff has not demonstrated good cause, the fact that remand is already required for procedural error relieves the plaintiff from having to affirmatively demonstrate "good cause" for failure to present these records earlier.  *See, e.g., Brown*, 2015 WL 3385845 at *8-9.  Moreover, these records are among those that the ALJ, having been duly notified of the plaintiff's regular pain therapy, had the affirmative duty to acquire in the first instance, and therefore should be considered on remand, notwithstanding defendants' argument that plaintiff was represented during the prior administrative proceedings.

## Conclusion

For the foregoing reasons, the court denies defendant's motion for judgment on the pleadings.  Upon remand, the ALJ should:

(1) Consider all record evidence, including objective medical tests, the opinions of treating physicians, the type and dosage of medication, and possible psychological factors probative of the intensity, persistence, and limiting effects of plaintiff's symptoms before finding on the credibility of plaintiff's claims of pain and fatigue; and

(2) Fully develop the record with regard to plaintiff's treatment for pain management with Dr. Isaac Kreizman, including records provided to the court documenting plaintiff's monthly appointments from May 11, 2010 to November 30, 2011.

The Clerk of the Court is respectfully requested to close this case.

**SO ORDERED.**

Dated:     Brooklyn, New York
           February 19, 2016

_____/s/_____
**KIYO A. MATSUMOTO**
United States District Judge
Eastern District of New York